| | | |
|---|---|---|
| MICAH L'MINGGIO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:17-cv-00571-JRS-DLP |
| | ) | |
| WEXFORD HEALTH, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**Order Granting in Part and Denying in Part
Medical Defendants' Motion for Summary Judgment**

Plaintiff Micah L'Minggio, an inmate of the Indiana Department of Correction ("IDOC") at the Wabash Valley Correctional Facility ("WVCF"), brings this action pursuant to 42 U.S.C. § 1983 alleging that he received inadequate medical care for pain in his foot. He sued the medical providers responsible for his care – Samuel Byrd, Mary Chavez, Car Kuenzli, Kimberly Hobson, Barbara Riggs, Wexford Health, and Corizon Health (the "Medical Defendants") – as well as two state officials who allegedly reviewed his grievances on the matter. The Medical Defendants have moved for summary judgment on Mr. L'Minggio's claims against them.[1] Mr. L'Minggio responded and the Medical Defendants have replied. For the following reasons, the motion for summary judgment is **granted in part and denied in part.**

### I. Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the

---

[1] The State Defendants were previously granted summary judgment on the claims against them. Dkt. 139.

record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trustees of Indiana University,* 870 F.3d 562, 573-74 (7th Cir. 2017). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson*, 477 U.S. at 255.

## II. Facts

### A. *The Defendants*

The Medical Defendants are several medical providers and their employers.

Dr. Byrd is a physician at WVCF. He was employed by Corizon, LLC ("Corizon") until April 1, 2017, when Wexford of Indiana, LLC ("Wexford") took over the provision of medical care to inmates in the IDOC. Dkt. 108-4, ¶ 3.

Dr. Chavez also was a physician at WVCF. She saw Mr. L'Minggio three times in late 2016 and early 2017. Dkt. 108-5, ¶ 2.

During the events at issue in this case, Dr. Kuenzli was Regional Medical Director for Wexford. Dkt. 108-8, ¶ 2. In this position, Dr. Kuenzli would review and approve requests for offsite medical care made by onsite physicians, including those from WVCF. *Id.* ¶ 3. If there were any questions or concerns, Dr. Kuenzli could discuss the referral during a collegial call with the onsite physician. *Id.*

Barbara Riggs is a registered nurse employed at WVCF, first by Corizon and then Wexford. Dkt. 108-6, ¶¶ 1-2. She is often assigned to perform sick call at the facility. *Id.* ¶ 3. IDOC directives require patients to submit a written health care request form ("HCRF") for any non-emergent medical needs they may have. *Id.* ¶ 4. For non-urgent requests, a patient is most often scheduled for an initial evaluation by a nurse during nurse sick call. *Id.* ¶ 4. During these visits, it is the nurse's responsibility to triage and assess the patient to determine if their medical needs can be appropriately managed through use of nursing protocol orders or if a referral to a practitioner is required. *Id.* As a registered nurse, Nurse Riggs does not have the authority to diagnose a patient or order specific medical treatment. *Id.* ¶ 5. However, she can triage patients, discuss medical concerns, provide certain types of treatment in accordance with nursing protocols, and determine if the medical need requires an evaluation by a practitioner. *Id.*

To Nurse Riggs's knowledge, the majority of her interactions with Mr. L'Minggio have come during nurse sick call assessments. Dkt. 108-6, ¶ 6. During all of these assessments, she would discuss with him the medical concerns as written on HCRF and determine if any treatment pursuant to the protocol was indicated or if a referral to a physician was necessary. *Id.* In addition, she would respond to HCRFs in writing with the responses sent back to the patient. *Id.* ¶ 8. When

Nurse Riggs performed an assessment or reviewed HCRFs, she looked for signs or indications of a new injury, a change in symptoms or circumstances, or other abnormality that required an evaluation by a practitioner. *Id.* ¶ 16. The medical records are clear that the physicians onsite were aware of Mr. L'Minggio's complaints of ankle and foot discomfort. *Id.* Where there was no change in his circumstances or exacerbation of his condition, Nurse Riggs provided Mr. L'Minggio information in the response and advised him to discuss these concerns in his upcoming chronic care appointments. *Id.* Her interactions with him will be discussed in more detail below.

Kimberly Hobson is a registered nurse and the Health Services Administrator ("HSA") at WVCF. As with Dr. Byrd and Nurse Riggs, she was employed by Corizon and then Wexford as HSA. Dkt. 108-7, ¶ 2. HSA Hobson did not treat Mr. L'Minggio. *Id.* ¶ 5. Instead, she would submit certain paperwork as ordered by the physicians, such as requests for non-formulary medications or requests for outside consultations. *Id.* HSA Hobson also reviewed, as part of her administrative duties, a formal grievance filed by Mr. L'Minggio. *Id.* ¶ 6. However, it was not part of her duties as HSA and is beyond the scope of her practice as a registered nurse to diagnose a patient or refer a patient to a specialist. *Id.* ¶¶ 4-5.

B. *Mr. L'Minggio's Foot Injury*

During a prior incarceration in the IDOC, Mr. L'Minggio suffered a significant injury to his right foot while playing basketball. Dkt. 108-4, ¶ 5. Dr. Ertle evaluated L'Minggio on June 23, 2009, and diagnosed him with a talotarsal dislocation. Dkt. 108-2, p. 130-31. A talotarsal dislocation occurs when the ankle bone (the talus) is displaced from the hind-foot bones, the calcaneus and navicular bones. Dkt. 108-4, ¶ 5. For reference, the following diagram identifies the relevant bones in the foot. *See id.*



To repair the dislocation, Dr. Ertle performed surgery to fuse the talus to the navicular bone, and the navicular bone to one of the cuneiform bones. Dkt. 108-4, ¶ 6. Dr. Ertle used internal fixation hardware as part of the surgery. Dkt. 108-2, p. 130-31.

C. *Treatment Outside of the IDOC*

After his release from the IDOC, Mr. L'Minggio went to the Emergency Department of Community Howard Regional Health ("Community") on September 5, 2010, due to foot pain lasting a month. Dkt. 108-2, p. 119. He had swelling and a painful range of motion in his foot. Dkt. 108-2, p. 119. The hospital staff took x-rays and recommended an orthopedic follow up, but otherwise sent Mr. L'Minggio home for self-care. Dkt. 108-2, p. 119-21. He was provided crutches and medication. *Id.* Mr. L'Minggio did not make an appointment with an orthopedic surgeon because he did not have health insurance. Dkt. 108-9, p. 81.[2] He hoped to return to the hospital that had performed the surgery and get something done. *Id.*

On January 16, 2011, Mr. L'Minggio returned to Community. Dkt. 108-2, p. 122. He reported pain in his right foot, progressively worsening over the last several months. Mr. L'Minggio stated that he had an appointment at Wishard for loose screws and a breaking metal

---

[2] Citations to Mr. L'Minggio's deposition are to the original transcript page numbers, not the page numbers "stamped" on the document when it was filed in CM/ECF.

plate, but no transportation to get there. *Id.* He was discharged with instructions to "follow-up with orthopedic surgeon th[at] week for repair of foot and chronic pain management." Dkt. 108-2, p. 124. The hospital staff prescribed Lortab, a narcotic, for severe pain and ibuprofen for less severe pain. *Id.*

On February 8, 2011, Mr. L'Minggio returned to Community again. Dkt. 108-4, ¶ 9; dkt. 108-2, p. 125. He requested hydrocodone for pain. *Id.* Mr. L'Minggio had not scheduled his appointment with an orthopedic doctor as directed. *Id.* Medical staff released Mr. L'Minggio and directed him to follow up with the orthopedic surgeon, "for recommended surgery." Dkt. 108-2, p. 127. He was instructed to rest, elevate his foot, use crutches, and take Tylenol and Ibuprofen. *Id.*

### C. *Treatment at Plainfield Correctional Facility*

Mr. L'Minggio re-entered IDOC and resided at the Plainfield Correctional Facility ("IYC"). Dkt. 108-4, ¶ 11. On June 14, 2012, he saw a nurse for post-surgical foot pain. Dkt. 108-1, p 67. He reported that the pain was severe, "12/10," constant, and had been present since surgery. *Id.* Mr. L'Minggio could not stride fully or bend his foot. Dkt. 108-1, p. 68. The nurse noted muscle weakness in the right foot when compared to the left, a limited range of motion ("ROM"), and pain with palpation on top of the foot. Dkt. 108-1, p. 68. The right foot was swollen, particularly on top. *Id.* The nurse referred Mr. L'Minggio to a provider and scheduled x-rays. *Id.* The x-rays showed the fusion involving the talus, navicula, and first cuneiform in L'Minggio's right foot. Dkt. 108-2, p. 82. There were degenerative changes, but no indication that the fusion or the hardware had failed. *Id.* Based on his symptoms and the x-ray, Mr. L'Minggio appeared to have degenerative joint disease ("DJD") in his foot and ankle. Dkt. 108-4, ¶ 13. Traumatic injury with surgery, such as Mr. L'Minggio experienced, is known to cause osteoarthritis and joint degeneration with

associated pain and reduced range of motion. *Id.* DJD and arthritis are treated conservatively first, through pain medications and remaining physically active. *Id.* If the joint deteriorates, more invasive methods of treatment can be pursued, such as injections or surgery. *Id.* However, considering that potential surgical complications are often irreversible, doctors usually start with conservative treatment. *Id.*

On January 1, 2013, a nurse saw Mr. L'Minggio for foot pain. Dkt. 108-2, p. 83. He reported unbearable pain and difficulty walking and that he thought that a metal plate in his foot had broken. *Id.* She provided Tylenol and referred him to a provider. *Id.*

A nurse practitioner evaluated Mr. L'Minggio on January 8, 2013. He reported that "there is something wrong" with his surgical repair. Dkt. 108-1, p. 47. The nurse practitioner noted his history and reviewed the latest x-ray, which showed no issue with the fusion and only minor post-surgical changes. *Id.* She noted that Mr. L'Minggio walked without assistance and had no other issues. *Id.* She provided education, but no other treatment. *Id.*, p. 49.

After further time in the community, Mr. L'Minggio re-entered the IDOC on December 5, 2013, and he remains incarcerated. While out of prison, Mr. L'Minggio testified that he did not take any over the counter medications beyond what the outside hospitals had provided to manage pain. Dkt. 108-9, p. 84-85. He did not use a brace on his ankle, although his aunt would wrap it in an ACE bandage. *Id.*, p. 85. At the Reception and Diagnostic Center ("RDC"), Mr. L'Minggio reported a history of surgical repair and that the hardware broke in 2010. Dkt. 108-1, p. 29. The nurse practitioner advised him to follow up at his long-term facility if he did not improve. *Id.*, p. 30.

D. *Treatment at WVCF*

On December 26, 2013, Mr. L'Minggio arrived at WVCF. Dkt. 108-4, ¶ 18. The nurse who performed his intake screening noted that he had no disability and could perform activities of daily living. Dkt. 108-1, p. 5. He did not use a cane or other assistive device to walk. *Id.* The nurse did not see any indication that Mr. L'Minggio required referral to a provider. *Id.*, p. 8. Mr. L'Minggio testified that he did not have trouble walking. Dkt. 108-9, p. 89. Mr. L'Minggio then complained of pain from late 2014 through 2017.

1. Treatment in 2015

On January 9, 2015, Nurse Riggs saw Mr. L'Minggio for evaluation of foot pain. Dkt. 108-1, p. 113. He reported the pain began on December 29, 2014, and that his foot hurt constantly and sometimes "locks up." *Id.* He thought that a plate in his foot was broken. *Id.*, p. 114. Nurse Riggs contacted Dr. Martin for orders and advised Mr. L'Minggio to call sick call if symptoms did not subside or if they worsened. *Id.*, p. 114. Dr. Martin ordered x-rays of Mr. L'Minggio's foot and ankle and prednisone 20 mg. twice a day for ten days. *Id.*, p. 116-17. The x-ray did not show any acute bony abnormality in the right foot, and the hardware was intact. Dkt. 108-2, p. 87. There was a persistent space in the talonavicular joint, but the tarsal elements were in anatomical alignment. *Id.* This may indicate that the fusion either never occurred or later failed. Dkt. 108-4, ¶ 20.

On January 9, 2015, Dr. Byrd first evaluated Mr. L'Minggio. Dkt. 108-1, p. 118. Mr. L'Minggio reported that he injured his foot in 2009 and received surgery with hardware. *Id.* Dr. Byrd thought that Mr. L'Minggio had probably experienced a dislocation at the time of injury. *Id.* Since surgery, Mr. L'Minggio had reported chronic pain that was sharp and sometimes burning. *Id.* He associated difficulty walking with swelling and pain. *Id.* Mr. L'Minggio stated that he was told in 2012 that a screw had broken loose and that it "must come out." *Id.* No doctor told him this;

rather, Mr. L'Minggio assumed it from the x-ray. Dkt. 108-9, p. 87. The June 2012 x-ray showed fusion of the talus, navicular, and first cuneiform, but no screw or plate fracture. Dkt. 108-1, p. 118. Dr. Byrd noted some mild midfoot swelling and some deformity in Mr. L'Minggio's mid foot. He diagnosed acute midfoot arthritis. Dkt. 108-4, ¶ 21. Based on the most recent x-ray, Dr. Byrd determined that one screw attached to the plate in Mr. L'Minggio's midfoot had fractured, but the screw was contained in the bone and unlikely to cause pain because it would not interact or impact on the soft tissue or nerves. *Id.*, ¶ 22. It was essentially part of the bone at this point. *Id.* The hardware alignment was excellent. *Id.* Dr. Byrd prescribed Mr. L'Minggio ten days of prednisone 20 mg twice a day to reduce acute inflammation. *Id.* Considering there was no fracture, bony deformity, or other acute abnormality in Mr. L'Minggio's foot, Dr. Byrd did not think referral to a surgeon or foot specialist was warranted at this time. *Id.*

Mr. L'Minggio thought he needed surgery as of January of 2015, because he knew his own body and his condition was not improving. Dkt. 108-9, p. 90-91. Mr. L'Minggio agreed that it was reasonable for Dr. Byrd to first try less invasive treatment before reaching surgery, but he believes it took too long. *Id.*, p. 92-93.

On February 11, 2015, Dr. Byrd followed up with Mr. L'Minggio. Dkt. 108-1, p. 110. Dr. Byrd noted that recent x-rays showed an attempted fusion of talonavicular and naviculocuneiform joints with persistent talonavicular space. *Id.* Mr. L'Minggio reported instability at times which seemed to correspond with increased swelling and pain. *Id.* He reported that winter, standing, and walking increased pain and swelling. *Id.* He had weakness of his foot, some swelling, and decreased range of motion. *Id.* These symptoms are consistent with osteoarthritis and DJD. Dkt. 108-4, ¶ 23. Dr. Byrd noted no significant improvement on prednisone, so he planned to prescribe Pamelor (nortriptyline), a tricyclic antidepressant used to manage chronic pain. Unlike narcotics,

the effects of Pamelor are not immediate. Instead, a patient must to stay on the medication for a period of time before experiencing the analgesic properties. Dkt. 108-4 ¶ 23. He also continued Mr. L'Minggio on prednisone. *Id.* Dr. Byrd thought a lace-up ankle brace would benefit Mr. L'Minggio and he received the brace on March 12, 2015. *Id.*, ¶ 23; Dkt. 108-1, p. 109.

When Dr. Byrd followed up on May 13, 2015, Mr. L'Minggio did not report significant improvement with prednisone and Pamelor; however, he was not in apparent distress. Dkt. 108-1, p. 106-07. Dr. Byrd noted gait disturbance, some swelling in the right foot, a decreased range of motion, and tenderness with palpation. *Id.* p. 107-08. Dr. Byrd ordered Tegretol (carbamazepine), 200 mg, twice a day. *Id.* This is an anticonvulsant that also has analgesic properties. Dkt. 108-4, ¶ 24. He planned to reschedule Mr. L'Minggio in the chronic care clinic for his ankle pain. Dkt. 108-1, p. 108.

On July 1, 2015, Nurse Riggs saw Mr. L'Minggio during a nursing sick call. Dkt. 108-1, p. 100-03. She noted that L'Minggio walked without difficulty, worked in the production kitchen ("PK"), and stood most of the day. *Id.* p. 101. Mr. L'Minggio worked four days a week, five or six hours a day. *Id.*, p. 100. He would stand two and a half or three hours. *Id.* Nurse Riggs noted that he was not responding to protocol and referred him to a provider for evaluation. *Id.*, p. 101.

On July 9, 2015, Dr. Byrd saw Mr. L'Minggio in the chronic care clinic. Dkt. 108-1, p. 97-99. Mr. L'Minggio had not tried Tegretol yet because he did not realize that he needed to go to the med window to receive it. Dkt. 108-1, p. 97. Dr. Byrd assessed Mr. L'Minggio with osteoarthritis. *Id.*, p. 98. He planned to have Mr. L'Minggio return in one month to see how he responded to Tegretol. *Id.*, p. 99. Like Pamelor, it can take several weeks for the analgesic properties of Tegretol to be appreciated by patients. Dkt. 108-4, ¶ 26.

On August 12, 2015, Dr. Byrd re-evaluated Mr. L'Minggio. Dkt. 108-1, p. 94. He noted that Mr. L'Minggio had a decreased ROM and tenderness to palpation in his right foot, but no bruising or swelling. *Id.*, p. 96. Mr. L'Minggio did not seem to have improved on nonsteroidal anti-inflammatories ("NSAIDs"), prednisone, Pamelor, or Tegretol. *Id.* Dr. Byrd planned to prescribe Neurontin (gabapentin), one 300 mg tab twice a day. *Id.* Neurontin is an anticonvulsant, similar to Tegretol. Dkt. 108-4, ¶ 27. Unlike Tegretol, though, Neurontin is subject to abuse because it causes sedation when taken in large quantities and is commonly abused in the prison setting. *Id.* Thus, providers will first try a patient on other anticonvulsants less subject to abuse before proceeding to Neurontin. *Id.* Often a patient may respond better to one type of medication in a class than another. *Id.* This is why Dr. Byrd decided to try Mr. L'Minggio on Neurontin. *Id.* Neurontin initially helped L'Minggio's pain. Dkt. 108-9, p. 97.

Dr. Byrd requested renewal of Neurontin regularly as Mr. L'Minggio responded well to the medication. Dkt. 108-4, ¶ 30. When he sought renewal on December 23, 2015, Dr. Byrd had obtained labs for Mr. L'Minggio to assess the level of Neurontin in his system; this could signal misuse of the medication. *Id.* Mr. L'Minggio's Neurontin levels were somewhat low. *Id.* Mr. L'Minggio told Dr. Byrd that he had difficulty reaching the medication window for his morning dose as he worked in PK, so Dr. Byrd arranged for him to receive his dose early. *Id.*

### 2. Treatment in 2016

In February of 2016, Mr. L'Minggio filed a grievance concerning his chronic foot pain. Dkt. 108-7, ¶ 6. HSA Hobson responded to the grievance. *Id.* In his grievance, Mr. L'Minggio requested surgery. *Id.* HSA Hobson reviewed his record and noted he had received evaluation extensively in 2015 concerning his ankle pain, but he had not submitted a HCRF since November 17, 2015. *Id.* The onsite physicians decide whether surgery is indicated. *Id.* ¶ 7. As Mr. L'Minggio

had not recently reported any issues with his ankle, HSA Hobson directed him to submit a HCRF so that he could be evaluated by his provider. *Id.*, ¶ 7. HSA Hobson, as a registered nurse, could not approve a referral to a surgeon or order surgery. *Id.* ¶ 6.

On March 24, 2016, Dr. Byrd evaluated Mr. L'Minggio. Dkt. 108-2, p. 77. At this point, nurses were delivering Mr. L'Minggio's medications to his cell daily, so he did not need to walk to the med window. *Id.* Dr. Byrd ordered an increase in the Neurontin dose to 600 mg twice a day and requested Neurontin levels. *Id.* He also ordered a lace-up ankle brace and insoles. *Id.* Dr. Byrd did not see any significant alteration in Mr. L'Minggio's condition which would indicate his internal fixation had loosened or broken, or that his foot could not be managed conservatively. Dkt. 108-4, ¶ 32. The Neurontin prescription continued to be renewed at 600 mg twice a day. Dkt. 108-2, p. 67.

On September 19, 2016, Mr. L'Minggio submitted a HCRF asking if he could receive his Neurontin medication at different times. Dkt. 108-6, ¶ 11. Nurse Riggs reviewed the request and responded indicating that medications such as Neurontin could only be given at two separate times, morning and evening, absent an order by the practitioner. *Id.* In this HCRF, Mr. L'Minggio was not complaining of any exacerbation of his injury, or increase in pain, and as such, Nurse Riggs did not believe a referral to the practitioner was required. *Id.*

On September 21, 2016, Dr. Chavez saw Mr. L'Minggio for the first time. Dkt. 108-2, p. 55; dkt. 108-5, ¶ 4. She reviewed his history and confirmed his Neurontin levels were appropriate. Dkt. 108-5, ¶ 4. At the time of this appointment, Dr. Chavez understood the following concerning Mr. L'Minggio's medical history: he reported consistent right ankle pain. He had experienced a severe fracture to the right ankle while playing basketball. He reported that he had been told that the hardware was broken, and he believed this is why he had persistent pain and swelling in his

right ankle and the proximal aspect of his right foot. He wanted surgery. *Id.* Dr. Chavez noted that the recent x-ray showed an attempted arthrodesis of the talonavicular and naviculocuneiform joints with persistent talonavicular joint space. Dkt. 108-2, p. 55. Mr. L'Minggio reported a feeling of instability at times and this seemed to coincide with increased pain and swelling. *Id.* He reported difficulty walking distances due to pain. *Id.* Dr. Chavez planned to use both Tylenol and Neurontin together to improve pain control. *Id.* She prescribed Tylenol 500 mg, two tabs, twice a day, instructing that he should take the medications at 5:30 am and at 5:30 pm. *Id.* On October 4, 2016, Dr. Chavez also requested renewal of the Neurontin 600 mg twice a day. *Id.*, p. 51. Mr. L'Minggio testified that the Tylenol helped. Dkt. 108-9, p. 100. He asked to renew it. *Id.*, p. 101.

On December 7, 2016, Dr. Chavez saw Mr. L'Minggio again. Dkt. 108-2, p. 47. He had improvement with Neurontin. He reported that the Tylenol also helped, particularly in the morning. *Id.* As his current course of medication improved his condition, Dr. Chavez requested renewal of the Tylenol two 500 mg tabs, twice daily. *Id.* Mr. L'Minggio also remained on Neurontin. *Id.*

### 3. Treatment in 2017

On March 7, 2017, Dr. Chavez re-evaluated Mr. L'Minggio for foot pain as part of a chronic care visit. Dkt. 108-2, p. 22. He reported right foot pain of eight out of ten, improved to 4.5 out of ten with medication. *Id.*, p. 25. This indicated that the pain medication was effective. Dkt. 108-5, ¶ 7. After significant trauma and the development of osteoarthritis, it may not be possible to reach a completely pain-free state without overmedicating the patient. *Id.* Mr. L'Minggio reported that he could not do squats, jumping jacks, running, or leg-presses. Dkt. 108-2, p. 26. When the pain was at its worst, he reported difficulty walking. *Id.* He reported that he could not perform his home exercise plan of flexing/extending/rotating his ankle in the morning. *Id.* Dr. Chavez noted that his right foot was slightly swollen. *Id.* She ordered an x-ray due to

suspected osteoarthritis as his most recent x-rays were on January 9, 2015. *Id.* Mr. L'Minngio remained on Tylenol 500 twice a day and Neurontin 600 mg twice a day. *Id.* Dr. Chavez did not see him after this. Dkt. 108-5, ¶ 7.

The x-ray revealed a possible issue with the hardware in Mr. L'Minggio's foot: lucency surrounding hardware at the anterior process of the talus suggesting loosening. Dkt. 108-2, p. 91. Dr. Byrd states that this is the first concerning issue he viewed on an x-ray. Dkt. 108-4 ¶ 40. These new findings factored into the decision to seek a surgical evaluation. Dkt. 108-2, p. 2, 8-9; dkt. 108-5, ¶ 9.

On April 1, 2017, Wexford began to provide medical services to the inmates at IDOC. Dkt. 108-4, ¶ 41. On May 15, 2017, a nurse evaluated Mr. L'Minngio for foot pain, noting swelling and referred Mr. L'Minggio to a physician. Dkt. 108-2, p. 18. On May 23, 2017, Nurse Riggs noted the medical status classification for Mr. L'Minngio as G2: any stabilized, permanent, or chronic physical or medical condition where the offender demonstrates an appropriate degree of knowledge and motivation and is able to perform self-care. *Id.*, p. 14. In addition, Mr. L'Minngio was provided crutches. *Id.*, p. 293.

On June 13, 2017, Dr. Byrd evaluated Mr. L'Minggio regarding his persistent right ankle pain. Dkt. 108-2, p. 10. Although he had reported Neurontin improved his condition, his Neurontin levels were not detectible suggesting that Mr. L'Minggio was not taking it. Dkt. 108-2, p. 10. In reviewing the most recent x-rays, Dr. Byrd noted the radiologist's assessment of lucency around the hardware, suggesting possible loosening. *Id.* Mr. L'Minggio reported less pain and swelling, but he also stated that some days the pain was so severe that he could barely walk. Dkt. 108-2, p. 8. Dr. Byrd noted that Mr. L'Minggio had a compensated gait. Dkt. 108-2, p. 11. His right foot and ankle had swelling and a moderately reduced ROM. *Id.* Dr. Byrd planned to discuss the request

for an operation in a collegial call. *Id.* Dr. Byrd noted that Mr. L'Minggio was threatening to sue and counseled him to be patient so he could review his chart in its entirety and formulate a long-term strategy. *Id.*, p. 10. Dr. Byrd provided him with passes for bottom range and bottom bunk. *Id.*, p. 11. At this point, Dr. Byrd testifies that there was a change in Mr. L'Minggio's objective signs and symptoms, including a deterioration in his activities of daily living, and in his x-ray results, so that Mr. L'Minggio may have required more than medication management. Dkt. 108-4, ¶ 46.

On June 29, 2017, Dr. Byrd requested the orthopedic appointment. Dkt. 108-2, p. 8-9. Dr. Kuenzli did not approve this request. Dkt. 108-2, p. 113. He advised Dr. Byrd to obtain the old surgical notes so that they could be reviewed in the collegial call in one week. *Id.* Dr. Kuenzli does not recall the specifics of this telephone call, but the records indicate that he and Dr. Byrd discussed Mr. L'Minggio's medical history and noted that they did not have any records regarding the prior injury, surgery, or medical care following surgery, from Mr. L'Minggio's prior admission to the IDOC. Dkt. 108-8, ¶ 6. Dr. Kuenzli recommended that they hold off on making any final decision regarding outpatient referrals while they obtained and reviewed the prior surgical and outpatient records, as well as complete an in-depth review of the most recent records,. *Id.*

On July 3, 2017, based upon the records that had been submitted, it was clear that L'Minggo's ankle condition was a chronic condition, as he had received surgery almost a decade prior. Moreover, they had no knowledge of any complaints or significant abnormalities following the original surgery. It would be expected that if there were problems with the prior surgery, notations would be in the surgical records. As such, Dr. Kuenzli did not believe that he and Dr. Byrd had a sufficiently complete medical picture. For these reasons, he recommended that a referral wait for a few weeks, so that this information could be obtained and reviewed. *Id.* ¶ 9.

On July 18, 2017, Dr. Byrd evaluated Mr. L'Minggio. Dkt. 108-2, p. 4. He advised Mr. L'Minggio that he would be discussing whether to send him to a specialist with his colleagues in the near future. *Id.* During this appointment, Mr. L'Minggio had much less pain since the last visit and minimal swelling. *Id.* Dr. Byrd noted to request Mobic, another NSAID. *Id.*, p. 5. He assessed Mr. L'Minggio with non-union/malunion of fracture. *Id.* Mr. L'Minggio reported that, while he was out of prison, he received hydrocodone for pain and arrangements were being made for surgery. Dkt. 108-2, p. 5. Dr. Byrd planned to obtain his outside medical records. Dkt. 108-4, ¶ 49. On August 4, 2017, Dr. Kuenzli and Dr. Byrd had a collegial discussion regarding Mr. L'Minggio's care. Dkt. 108-8, ¶ 10. The onsite staff had obtained copies of emergency room records following L'Minggio's 2009 surgery, but not yet a copy of the operative reports. *Id.* Dr. Kuenzli was informed these records had been requested and should be obtained soon, and Dr. Byrd and Dr. Kuenzli agreed to discuss once again the potential referral after the operative reports were received. *Id.*

On August 7, 2017, Mr. L'Minggio submitted a HCRF stating that he would like stronger pain medication. Dkt. 108-6, ¶ 10. Nurse Riggs reviewed the chart, noting that Mr. L'Minggio had just recently been evaluated by Dr. Byrd and that Dr. Byrd was discussing an outside referral to a specialist. *Id.* At this time, L'Minggio had also received a number of accommodations, including a low bunk permit, a low gallery assignment, as well as crutches. *Id.* He was also scheduled to follow up with Dr. Byrd in the coming days to discuss the potential outside referral. *Id.* Nurse Riggs noted that Mr. L'Minggio should continue his medications as ordered. *Id.*

On August 18, 2017, Dr. Kuenzli and Dr. Byrd discussed the case and reviewed Mr. L'Minggio's records, including the surgery that Dr. Ertle performed on June 23, 2009. Dkt. 108-2, p. 296. At this time, the doctors had copies of the prior outpatient records, ER records, and the

operative reports. Dkt. 108-8, ¶ 11. The operative report indicated that Mr. L'Minggio's prior 2009 surgery did not go quite as planned, and the operative report outlined the extensive nature of the hardware that had been inserted for the internal fixation of the prior fracture. *Id.* While the records indicated that Mr. L'Minggio had not complained of any significant or serious discomfort, the records documented a history of ankle discomfort. *Id.* Dr. Kuenzli agreed with the recommendation of Dr. Byrd for Mr. L'Minggio to receive an outpatient orthopedic examination regarding his ankle discomfort. *Id.*

On August 28, 2017, Mr. L'Minggio submitted a HCRF asking to follow up with Dr. Byrd regarding treatment of his foot, and also requesting results of an x-ray. Dkt. 108-6, ¶ 12. Nurse Riggs reviewed the medical chart, noting that x-rays had been completed, and attached the x-ray results for Mr. L'Minggio's review. *Id.* Further, since Mr. L'Minggio was not complaining of any change in circumstance or significant exacerbation of his pain, she did not refer him to a provider. She instead instructed him that he could follow-up with the provider during a chronic clinic appointment, which she confirmed was upcoming. *Id.* According to her review of the records, Mr. L'Minggio was seen during a chronic clinic appointment approximately three weeks later. *Id.*

On August 29, 2017, Dr. Byrd ordered new x-rays of Mr. L'Minggio's ankle. Dkt. 108-2, p. 1. The x-rays showed no acute bony abnormalities in the right ankle, but he had mild degenerative changes. Dkt. 108-2, p. 139. This indicated that Mr. L'Minggio had some arthritis in his ankle. *Id.*

On September 13, 2017, Dr. Kleinman, a podiatrist, evaluated Mr. L'Minggio. Dkt. 108-2, p. 140. Mr. L'Minggio reported aching and throbbing to his foot and that normal activity was difficult due to constant pain. *Id.* Dr. Kleinman noted that his right ankle was tender to touch. *Id.*, p. 141. There was some swelling and enlargement of the bone in the right mid-foot. *Id.* Mr.

L'Minggio's limped because of right foot pain. *Id.* Reviewing x-rays, Dr. Kleinman noted evidence of the prior surgery with attempts at fusion in the talonavicular joint. The internal fixation was well positioned. There was a nonunion of the talonavicular joint and moderate osteoarthritis. Dr. Kleinman diagnosed non-union of the prior fusion in talonavicular joint. Dr. Kleinman did not see any indication of broken hardware. *Id.*, p. 341.

Dr. Kleinman discussed his plan and the x-rays with Mr. L'Minggio. His notes state:

> Patient Counseling:
> 1. Reviewed with the patient my impressions.
> 2. Reviewed x-ray studies.
> 3. Reviewed nature of nonunion talonvicular joint. Reviewed rationale for his prior surgery. Reviewed treatment options, both conservative and surgical. This included benign neglect, physical therapy, injections of cortisone and revision surgery. Pros and cons of each were reviewed.

Dkt. 108-2, p. 142. "Benign neglect" is another way of stating no intervention in the foot at all, so that it can be managed conservatively as it had been with pain medications. Dkt. 108-4, ¶ 53. Surgery often includes significant risks, so that providers and their patients may reasonably decide that it is best to manage conservatively and not perform surgery. *Id.* Dr. Kleinman specifically addressed with Mr. L'Minggio the possible complications of surgery and emphasized the need for postoperative compliance. Dkt. 108-2, p 142. Mr. L'Minggio decided to pursue surgery. *Id.* Dr. Kleinman recommended a revision of the fusion of the right foot. Dr. Kuenzli agreed to the surgery on September 15, 2017. Dkt. 108-2, p. 141. Mr. L'Minggio testified that Dr. Kleinman told him that he needed to have surgery, and that Dr. Kleinman's recommendation of alternative courses of treatment, including benign neglect, was not what Dr. Kleinman told him at the appointment. Dkt. 108-9, p. 47.

On October 10, 2017, L'Minggio submitted a HCRF indicating that his foot was in pain. Dkt. 108-6, ¶ 9. Nurse Riggs reviewed the records, noting that Mobic had been prescribed for pain,

that he had been approved for surgery, and that he should continue his medication as ordered by the physician. *Id.* Nurse Riggs advised L'Minggio of this in the response, and thereafter this response was provided to him on October 12, 2017. *Id.* Mr. L'Minggio underwent surgery on November 22, 2017. Dkt. 108-2, p. 183-84.

### III. Discussion

The defendants move for summary judgment on Mr. L'Minggio's claims. Because he was a convicted inmate at the time giving rise to these claims, Mr. L'Minngio's treatment is evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."). To prevail on an Eighth Amendment claim based on deliberate indifference to serious medical needs, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed, but disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). "[C]onduct is 'deliberately indifferent' when the official has acted in an intentional or criminally reckless manner, *i.e.*, 'the defendant must have known that the plaintiff was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so.'" *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (quoting *Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998)).

For purposes of summary judgment, the defendants do not argue that Mr. L'Minggio's foot pain was not a serious medical need. But they argue that they were not deliberately indifferent to that need.

A. <u>Dr. Byrd</u>

Dr. Byrd argues that he was not deliberately indifferent to Mr. L'Minggio's foot pain because he did not exacerbate his injury or unnecessarily prolong his pain. When Mr. L'Minggio arrived at WVCF in December of 2013, he walked without assistance, was not receiving pain medication, and his prior x-rays did not show broken hardware or any other issues with his surgery. Mr. L'Minggio started complaining of pain in late 2014. Dr. Byrd points out that he regularly evaluated Mr. L'Minggio's pain and attempted to treat it by prescribing alternative medications and providing him with an ankle brace. He concludes that conservative treatment with pain medications was reasonable.

Dr. Byrd concedes that a prison official may be deliberately indifferent if he or she persists in a course of treatment known to be ineffective, chooses an easier or less efficacious course of treatment, or there are "inexplicable delays" in treatment. *Pettis v. Carter*, 836 F.3d 722, 729–30 (7th Cir. 2016). But he argues that he did not persist in an ineffective course of treatment or cause any inexplicable delay in Mr. L'Minggio's treatment. According to Dr. Byrd, in September of 2016, when Mr. L'Minggio's x-ray showed loosening of the hardware, this was the first concerning issue Dr. Byrd viewed on an x-ray. Dr. Byrd also emphasizes the fact that when Mr. L'Minggio did see Dr. Kleinman, Dr. Kleinman noted that benign neglect was an option for Mr. L'Minggio's treatment.

Dr. Byrd's argument understates facts that are key to Mr. L'Minggio's claims. First, Dr. Byrd himself testifies that in January of 2015, Mr. L'Minggio's x-ray showed persistent space in the talonavicular joint, which "may indicate that the fusion either never occurred or later failed." Dkt. 108-4, ¶ 20. The purpose of the 2009 surgery was to "fuse the talus to the navicular bone, and

the navicular bone to one of the cuneiform bones." *Id.* ¶ 6. A reasonable jury might conclude that if Dr. Byrd could see in January 2015 that the fusion may have failed, he persisted in a course of treatment he knew would not work when he continued treating Mr. L'Minggio with pain medication for more than two years without referring him to a specialist.

Next, despite the conclusion of the January 2015 x-ray that the previous fusion had not worked or had failed, Dr. Byrd testifies that Mr. L'Minggio's March 2017 x-ray, which showed possible loosening in the hardware was the first concerning issue that he viewed on an x-ray. Dkt. 108-4, ¶ 40. But Dr. Byrd still did not request a referral to a specialist until June of 2017. Dkt. 108-4, ¶ 47. At that time, Dr. Kuenzli instructed Dr. Byrd to obtain Mr. L'Minggio's outside medical records. *Id.*, ¶ 49. A reasonable jury might conclude based on these facts that the delay from March until June in requesting a specialist was an unnecessary delay and therefore evidence of deliberate indifference.

In addition, to the extent that Dr. Byrd rests his argument on the fact that Dr. Kleinman counseled Mr. L'Minggio regarding benign neglect in 2017, there is at least an issue of fact regarding Dr. Kleinman's recommendations. Dr. Byrd refers to Dr. Kleinman's notes which state:

> Patient Counseling:
> 1. Reviewed with the patient my impressions.
> 2. Reviewed x-ray studies.
> 3. Reviewed nature of nonunion talonvicular joint. Reviewed rationale for his prior surgery. Reviewed treatment options, both conservative and surgical. This included benign neglect, physical therapy, injections of cortisone and revision surgery. Pros and cons of each were reviewed.

Dkt. 108-2, p. 142. Dr. Byrd relies on this note to conclude that Dr. Kleinman opined that benign neglect was a reasonable course. But these notes simply say that benign neglect was an option. They do not say whether it was a good option for Mr. L'Minggio or an option that Dr. Kleinman recommended. There is no other indication in the record regarding Mr. Kleinman's

recommendations to Mr. L'Minggio regarding this option. This note is insufficient to allow the Court to conclude that Dr. Kleinman endorsed benign neglect for Mr. L'Minggio.

Because a reasonable jury might conclude that Dr. Byrd persisted in a course of treatment that was not working and prolonged his pain, he is not entitled to summary judgment on Mr. L'Minggio's claims.

B. <u>Dr. Chavez</u>

Dr. Chavez also seeks summary judgment arguing that her actions set Mr. L'Minggio on the road to surgical revision. But, again, she had the same information available to her that Dr. Byrd had – namely that Mr. L'Minggio underwent surgery in 2009 meant to fuse the bones of his foot. She knew that he had difficulty walking distances, occasional instability, and that he had been complaining of persistent and severe pain for years. She saw him on September 21, 2016, December 7, 2016, and March 7, 2017. But it was not until March of 2017, because he was still reporting pain, that she ordered new x-rays. Based on these facts, a reasonable jury might conclude that Dr. Chavez's actions also unreasonably prolonged Mr. L'Minggio's pain. She is therefore not entitled to summary judgment.

C. <u>Dr. Kuenzli</u>

Next, Dr. Kuenzli seeks summary judgment arguing that he did not refuse Mr. L'Minggio surgery. Rather, he and Dr. Byrd obtained his outside medical records and reviewed them before deciding to seek a specialist consultation. There is no evidence that Dr. Kuenzli had any knowledge of Mr. L'Minggio's condition until Dr. Byrd requested an orthopedic consultation on June 29, 2017. Dkt. 108-2, p. 7-9. On July 2, 2017, Dr. Kuenzli asked Dr. Byrd to obtain Mr. L'Minggio's previous medical records. Dkt. 108-8, ¶ 7. When the outside records had been obtained, Dr. Byrd

and Dr. Kuenzli again discussed Mr. L'Minggio's condition. *Id.*, ¶ 11. Dr. Kuenzli then agreed with Mr. Byrd's recommendation that Mr. L'Minggio receive a consultation. *Id.*

Based on these facts, Dr. Kuenzli is entitled to summary judgment on Mr. L'Minggio's claims. There is no evidence that Dr. Kuenzli's request to see all of Mr. L'Minggio's records before seeking a consultation was improper, caused unnecessary delays of Mr. L'Minggio's treatment, or demonstrates any deliberately indifferent state of mind on his part.

D. Nurse Riggs

Nurse Riggs argues that she is entitled to summary judgment on Mr. L'Minggio's claims because she appropriately considered his HCRFs and referred him to a provider when she believed it to be necessary. In fact, when he complained of foot pain in January of 2015, Nurse Riggs sought orders from Dr. Martin. Dkt. 108-1, p. 113-14. In July of 2015, when he complained of pain that was not responding to treatment, she referred him to a doctor. *Id.*, p. 101. In August and October of 2017, when she reviewed an HCRF from Mr. L'Minggio, she reviewed the records, determined that he was receiving care from the provider and would be seen again in chronic care. Dkt. 108-6, ¶¶ 9-10. Mr. L'Minggio argues that Nurse Riggs was not qualified to diagnose him and should have referred all of his complaints to a doctor. But he has pointed to no evidence to support a conclusion that she did not exercise her medical judgment when considering his requests. And she did, in fact, refer him to a doctor regularly when she determined that his pain treatment was not working. As a matter of professional conduct, nurses may generally defer to instructions given by physicians, "but that deference may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient." *Berry v. Peterman,* 604 F.3d 435, 443 (7th Cir. 2010). There is no evidence to support a conclusion that Nurse Riggs did not exercise judgment when she considered Mr. L'Minggio's complaints. She is therefore entitled to summary judgment.

E. HSA Hobson

Next, HSA Hobson seeks summary judgment arguing that when she responded to his grievance, she reviewed his medial record to see what care he was receiving. She advised him to submit a HCRF so that he could be seen by a doctor. She argues that the onsite doctors decide whether a patient should be referred to a surgeon. Mr. L'Minggio argues that if HSA Hobson had reviewed his entire file, she would have seen that he had submitted multiple HCRFs regarding his pain and his request for surgery. But because it is undisputed that only a doctor, and not HSA Hobson, can make a referral to a specialist, HSA Hobson's act in advising Mr. L'Minggio to see a doctor was not deliberate indifference and she is entitled to summary judgment.

F. Wexford and Corizon

Finally, Wexford and Corizon seek summary judgment on Mr. L'Minggio's claims against them. To prevail on an Eighth Amendment claim against Wexford or Corizon under § 1983, Mr. L'Minggio must show (1) that Wexford or Corizon had an express policy that, when enforced, caused a constitutional deprivation, (2) that Wexford or Corizon had a practice so widespread that, although not authorized by written or express policy, was so permanent and well settled as to constitute a custom or usage with the force of law, or (3) that his constitutional injury was caused by a person with final policy making authority. *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012). Mr. L'Minngio has presented no evidence that his treatment was the result of a policy or practice on the part of Wexford or Corizon. Accordingly, they are entitled to summary judgment on his claims.

**IV. Conclusion**

For the foregoing reasons, the defendants' motion for summary judgment, dkt. [107], is **granted in part and denied in part**. The motion is **granted** as to Nurse Riggs, HSA Hobson, Dr.

Kuenzli, Wexford, and Corizon. The **clerk shall terminate** these defendants on the docket. No partial judgment shall issue as to these claims.

The motion is **denied** as to Dr. Byrd and Dr. Chavez. The claims against these defendants shall proceed to settlement or trial if necessary. The Court *sua sponte* reconsiders its previous denial of Mr. L'Minggio's request for assistance with recruiting counsel. That motion, dkt. [53], is now **granted**. The Court will attempt to recruit counsel to represent Mr. L'Minggio. The Court will set further proceedings when this step has been taken.

**IT IS SO ORDERED.**

Date: 3/5/2020

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

MICAH L'MINGGIO
198566
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
Electronic Service Participant – Court Only

All Electronically Registered Counsel